**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **J.S.G. *ex rel.* ARTURO SANTIAGO HERNANDEZ,** | * | |
| | * | |
| | * | |
| **Plaintiff-Petitioner,** | * | |
| | * | |
| **v.** | * | **Civil Case No. SAG-20-1026** |
| | * | |
| **HEIDI STIRRUP, *et al.*,** | * | |
| | * | |
| **Defendants-Respondents.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Petitioner J.S.G., a minor, by and through his grandfather, Arturo Santiago Hernandez ("Hernandez") filed the instant Petition for Judicial Review of Placement Pursuant to *Flores* Settlement Agreement, Complaint for Injunctive and Declaratory Relief, and Petition for a Writ of Habeas Corpus ("the Petition") on April 20, 2020.  ECF 1.  Petitioner brings this action against various officials, in their official capacity, within the United States Department of Homeland Security ("DHS"), the United States Department of Health and Human Services ("HHS"), the United States Immigration and Customs Enforcement ("ICE"), and the Office of Refugee Resettlement ("ORR"), a sub-department of HHS (collectively, "Respondents").  *Id.* Before the Court is Petitioner's Motion for Temporary Restraining Order and Preliminary Injunction for ORR to Release Unaccompanied Immigrant Child Who Will Otherwise Be Transferred to ICE Detention on his 18th Birthday – April 28, 2020.  ECF 7 ("the Motion"). After the Court ordered an expedited response, ECF 8, Respondents filed an Opposition, ECF 12, and Petitioner replied, ECF 14.  The Court held a hearing on the Motion on April 24, 2020.  For the reasons that follow, Petitioner's Motion for a TRO will be granted.

## I.      FACTUAL BACKGROUND

### A.      J.S.G.'s Arrival into the United States

J.S.G., a seventeen-year-old minor, is a Guatemalan national currently being held in detention by Respondent ORR.  ECF 1, ¶¶ 5, 16.  In February and March, 2018, while J.S.G. was still living with his parents in Guatemala, Guatemalan gang members  threatened J.S.G. with physical harm and death, and also threatened harm to one of J.S.G.'s family members.  *Id.* ¶¶ 16-17.  J.S.G. decided to flee to America to escape these threats.  *Id.* ¶¶ 17-18.

J.S.G.'s uncle accompanied him to the United States, and assured J.S.G.'s parents that he would live with, and care for, J.S.G.  *Id.* ¶ 18.  A few days prior to their trip, J.S.G.'s uncle obtained a fabricated birth certificate, representing that he was J.S.G.'s father.  *Id.* ¶¶ 18-19.  Despite his discomfort with the idea, J.S.G. went along with it, "because his uncle threatened to leave for the U.S. without him if J.S.G. did not comply."  *Id.* ¶ 19.

J.S.G. and his uncle reached the United States border at Texas on or about April 26, 2018, where they turned themselves in to immigration officers.  *Id.* ¶ 20.  J.S.G. and his uncle told the officers the fabricated story that J.S.G.'s uncle was actually his father.  *Id.*  The immigration officers eventually released J.S.G. and his uncle, and upon their release, handed J.S.G.'s uncle some "documents."  *Id.* ¶ 21.  At no point during this interaction did the immigration officers speak about J.S.G.'s need to attend an immigration court proceeding, nor did the officers provide J.S.G. with any documentation regarding such a need.  *Id.*

J.S.G. and his uncle then joined J.S.G.'s adult brother, Alex, in South Carolina.  *Id.* ¶ 22.  Alex asked J.S.G. if he had immigration court.  *Id.*  J.S.G. broached the subject with his uncle, who told J.S.G. "that they both had court but that they would not be going."  *Id.*  J.S.G. said he wanted to go, but his uncle said this "would cause problems," because the court would question

why J.S.G. was there, but not his "father."  *Id.*  Though this "worried" J.S.G., he followed his uncle's instructions and did not go to immigration court. *Id.* ¶¶ 23-24.

Unbeknownst to J.S.G., on October 29, 2018, because of J.S.G.'s failure to appear, J.S.G. was ordered deported in absentia by an Immigration Judge at the Charlotte Immigration Court. *Id.* ¶ 26.  On or about November 29, 2019, J.S.G. was arrested in North Carolina for driving under the influence, and driving without a license.  *Id.* ¶ 27.  J.S.G. first learned of his deportation order during a hearing related to the criminal charges.  *Id.*  On or about January 8, 2020, J.S.G. was transferred from juvenile detention in North Carolina to the Board of Child Care of the United Methodist Church, Inc. ("BCC"), which operates an ORR facility in Baltimore, Maryland.  *Id.* ¶¶ 11, 28; ECF 1-2 (ORR Placement Authorization for J.S.G.). J.S.G.'s placement authorization form at BCC lists the following "Reason for Placement": "An unaccompanied minor who meets the definition of an unaccompanied alien child, 6 U.S.C. 279(g)(2), and is in Federal custody by reason of his or her immigration status." ECF 1-2, ¶ 10.

### B.     Further Immigration Proceedings Involving J.S.G.

On March 13, 2020, J.S.G.'s immigration counsel, Ms. Cynthia Hodge ("Hodge") filed a Motion to Rescind and Reopen J.S.G.'s immigration proceedings in the Charlotte Immigration Court.  ECF 1, ¶ 35; ECF 1-4, ¶ 7 (Hodge Decl.).  The motion triggered an automatic stay of deportation until the immigration judge made a ruling.  ECF 1-4, ¶ 9.  Five days later, on March 18, 2020, United States Immigration Judge Rodger C. Harris issued a marginal Order denying J.S.G.'s Motion.  ECF 1-5.  Judge Harris's ruling gave the following brief rationale:

> Respondent gave false statements on arrival to immigration authority concerning family relationship.  Respondent has not attained UAC [unaccompanied child] status.  No application for relief filed.  No affidavits from uncle or brother filed. Both notice of hearing and order of removal were not returned to immigration court by USPS.  Reopen sua sponte is not appropriate in Respondent's case.

ECF 1-5.  According to the Order's Certificate of Service, J.S.G. was served with the Order, through counsel, on approximately April 13, 2020.  *Id.*  J.S.G.'s counsel asserts that they did not receive the Order via mail until Friday, April 17, 2020.  ECF 1, ¶ 46.  J.S.G. appealed the Order on April 21, 2020.  ECF 14-2.

### C.      The Efforts to Reunify J.S.G. with his Grandfather

Upon taking custody of J.S.G. in January, 2020, ORR began the process of finding a suitable individual sponsor for reunification.  ECF 12-1, ¶ 8.  The first sponsorship option ORR pursued was not viable.  *Id.*  In early February, 2020, ORR then began processing paperwork to reunify J.S.G. with his paternal grandfather, Hernandez, who lives in Myrtle Beach, South Carolina, as an alternative to keeping J.S.G. in detention at BCC.  ECF 1, ¶¶ 31-32.  J.S.G. and Alex both saw Hernandez about three times a week while they lived in South Carolina together, and Hernandez has maintained weekly phone contact with J.S.G. during his detention at BCC. *Id.* ¶¶ 32-33.  Hernandez completed the application for reunification by mid-March, 2020, and ORR completed a home study of Hernandez's residence on or about March 24, 2020.  *Id.* ¶¶ 34, 38.  Hernandez then received a positive home study recommendation in early April, 2020.  *Id.* ¶ 40.

While Hernandez's application was in process, on March 12, 2020, Hodge informed the ICE Field Office Juvenile Coordinator ("FOJC") that she would be filing a Motion to Reopen J.S.G.'s immigration case.  ECF 1-4, ¶ 7.  Hodge passed this information on to J.S.G.'s ORR Case Manager, Esly Marshall ("Marshall") on March 19, 2020.  *Id.*  On March 31, 2020, one of Hodge's colleagues asked Marshall whether J.S.G. might reunify with his grandfather prior to J.S.G.'s turning eighteen, but Marshall did not respond.  *Id.* ¶ 12.

On April 6, 2020, ORR Case Manager Daniela Rosales informed J.S.G.'s immigration counsel that the ICE FOJC had instructed the Federal Field Specialist ("FFS") at ORR, Hildamaria Powell, "not to let [J.S.G.] leave," and that "FFS [Powell] wanted to confirm . . . what work [counsel] have completed to address [J.S.G.'s] order of removal." *Id.* ¶ 41; ECF 1-4, ¶ 13 (Hodge Decl., J.S.G.'s immigration counsel). Hodge informed Rosales about the Motion to Reopen that was filed on March 13 and that an automatic stay was in place, though at that time, all parties were unaware that Judge Harris had already denied the motion. ECF 1, ¶ 41; ECF 1-4, ¶ 13. Upon further inquiry from immigration counsel, on April 7, 2020, Rosales confirmed that FFS Powell "did mention that at this moment we [cannot] move forward with reunification," ECF 1-4, ¶ 16, despite the fact that Hernandez had already received a positive recommendation to reunify with J.S.G., *id.* ¶ 17. J.G.S. heard from his ORR case managers that "[i]t's getting complicated because immigration doesn't want to let [him] leave," *id.* ¶ 20. As of April 10, 2020, Hernandez's impression was that ORR would be releasing J.S.G. to him, but he was not sure if that would be "in one or two days," or when the COVID-19 pandemic was over. *Id.* ¶ 21.

On April 14, 2020, ORR Case Manager Marshall informed J.S.G.'s counsel that he was in "quarantine due to a suspicious case of COVID-19 in the facilit[y]." *Id.* ¶ 22. Counsel learned four days later, from J.S.G. himself, that he was not sick, and that no medical professional had evaluated him. *Id.* ¶ 24. However, J.S.G. was in fact being "quarantined," which, according to BCC staff, means that "youth are to conduct all activities in their individual room." *Id.* ¶ 26. On April 20, 2020, Dr. Gregory Branch, the Health Officer and Director of Health and Human Services for Baltimore County, informed J.S.G.'s counsel that, while J.S.G. remains asymptomatic, he had contact with a minor on April 13, 2020, who was being tested for COVID-19. *Id.* ¶ 27. Dr. Branch recommended that J.S.G. could still reunify with his

grandfather as long as (1) he is still asymptomatic, (2) wears a mask, (3) does not utilize public transit, and (4) self-quarantines until April 27, 2020. *Id.* ORR acknowledged that it has considered J.S.G.'s "individual circumstances" and his potential exposure to COVID-19, and has concluded that COVID-19 "does not pose a barrier to his release." EF 12-1, ¶ 11 (De La Cruz Decl., Senior FFS, ORR).

On April 21, 2020, ORR learned from ICE's Office of Enforcement Removal Operations ("ERO"), Juvenile and Family Residential Management Unit, that ICE/ERO "intends to imminently remove J.S.G. from the United States (within two weeks)." ECF 12-1, ¶ 12. In light of this new information, "notwithstanding the suitability of J.S.G.'s grandfather and the minor's clearance for release by ORR health authorities," ORR made the decision to keep continued custody of J.S.G. *Id.* ¶ 13. To date, J.S.G. remains in ORR custody. He will "age out" of their custody on April 28, 2020, when he turns eighteen years old. J.S.G. believes that he will "most likely" be transferred to an ICE detention facility, if he is not reunified with Hernandez before April 28. ECF 1, ¶ 58. ORR "defers" to ICE as to whether a minor who ages out of ORR custody gets transferred to ICE custody. ECF 12-1, ¶ 13.

During the pendency of the action in this Court, ORR finally issued, telephonically, a formal declination of the reunification application. ECF 14-3, ¶ 6. However, Respondents offered to provide J.S.G. the opportunity for a "*Flores* bond hearing" before an immigration judge to determine whether he presents such a sufficient flight risk to justify his continued detention, and to abide by the results of that hearing, if the hearing could be held before J.S.G.'s eighteenth birthday. ECF 15. Counsel for J.S.G. have represented that they have asked the local immigration court to hold a hearing on Monday, April 27, 2020, but have not received a response. Given that Monday, April 27, 2020 is the next business day, and that neither party has

6

heard anything from the immigration court, it appears almost certain that a hearing will not take place on that date.

## II.     LEGAL STANDARDS

A temporary restraining order ("TRO") or a preliminary injunction is warranted when the movant demonstrates four factors: (1) that the movant is likely to succeed on the merits, (2) that the movant will face irreparable harm in the absence of preliminary relief, (3) that the balance of equities favors preliminary relief, and (4) that injunctive relief is in the public interest. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The movant must establish all four elements in order to prevail. *Pashby v. Delia*, 709 F.3d 307, 320–21 (4th Cir. 2013).

A temporary restraining order, much like a preliminary injunction, affords "'an extraordinary and drastic remedy' prior to trial." *Ultimate Outdoor Movies, LLC v. FunFlicks, LLC*, No. SAG-18-2315, 2019 WL 2642838, at \*6 (D. Md. June 27, 2019) (quoting *Munaf v. Green*, 553 U.S. 674, 689–90 (2008)); *see also MicroStrategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (stating preliminary injunctive relief is an "extraordinary remed[y] involving the exercise of far-reaching power [that is] to be granted only sparingly and in limited circumstances.") (citation omitted). Since preliminary injunctions are intended to preserve the status quo during the pendency of litigation, injunctions that "alter rather than preserve the status quo" are particularly disfavored. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 n.8 (4th Cir. 2019). Courts should grant such "mandatory" preliminary injunctions only when "the applicant's right to relief [is] indisputably clear." *Id.*

## III.    ANALYSIS

District courts are granted the authority to grant writs of habeas corpus pursuant to 28 U.S.C. § 2241(a) (2018).  Specifically, a petition for a writ of habeas corpus "may be granted," if the detainee can demonstrate, *inter alia*, that his continued detention is "in violation of the Constitution or laws or treaties of the United States." *Id.* § 2241(a), (c)(3); *see Maleng v. Cook*, 490 U.S. 488, 490 (1989) ("The federal habeas statute gives United States district courts jurisdiction to entertain petitions for habeas relief only from persons who are 'in custody in violation of the Constitution or laws or treaties of the United States.'" (citation omitted)).  "[T]he heart of habeas corpus," the Supreme Court has noted, is to allow a detainee to "challeng[e] the fact or duration of his physical confinement," and to "seek[] immediate release or a speedier release from that confinement." *Preiser v. Rodriguez*, 411 U.S. 475, 498 (1973).  Respondents here make no argument, nor does the Court find, that the Court lacks jurisdiction over Petitioner's habeas petition.  *See generally* ECF 12.  Thus, the Court proceeds to determine whether Petitioner has established his entitlement to injunctive relief, beginning with whether he is likely to succeed on the merits of his claims.

### A.    Petitioner Has Established a Likelihood of Success on the Merits

Petitioner asserts that his continued detention is unlawful for three reasons.[1]   First, Petitioner asserts that ORR's failure to release him to his grandfather violates the *Flores* Settlement Agreement.  ECF 7 at 23-24.  Second, he argues that ORR has failed to promptly release him, as mandated by the Trafficking Victims Protection Reauthorization Act of 2008.  *Id.* at 13-18.  Finally, Petitioner claims that ORR has violated his procedural due process rights.  *Id.*

---

[1] Petitioner also asserted a claim under the Administrative Procedures Act, arguing that ORR's then-pending decision on his reunification application was "unreasonably delayed."  ECF 7 at 18-23; *see* 5 U.S.C. § 706(1) (2018).  Petitioner correctly concedes, however, that since ORR has now formally denied his reunification application, his § 706(1) claim is moot.  ECF 14 at 7.

at 24-29.  Because Petitioner has shown a strong likelihood of succeeding on the first two claims, the Court need not address the merits of the third.  *See, e.g.*, *Stinnie v. Holcomb*, 355 F. Supp. 3d 514, 527 (W.D. Va. 2018) ("[A]ll that is necessary for preliminary injunctive relief is establishing the likelihood of success on at least one of their claims.").

        1.      <u>Petitioner Is Likely to Show that His Continued Detention Violates the *Flores* Settlement Agreement</u>

Petitioner asserts that Respondents' actions "violate their contractual obligations" set forth in a consent decree known as the *Flores* Settlement Agreement ("FSA").  ECF 7 at 23-24; *see Flores v. Reno*, Case No. CV 85-4544-RJK(Px) (C.D. Cal. Jan. 17, 1997), https://www.aila.org/ File/Related/14111359b.pdf.  The *Flores* Settlement Agreement sets the "nationwide policy for the detention, release, and treatment" of "[a]ll minors who are detained in the legal custody of the INS," and its successor agencies, including ORR.  FSA, ¶¶ 9-10; *see Flores v. Sessions*, 862 F.3d 863, 870 (9th Cir. 2017) (noting that the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002) (codified at 6 U.S.C. § 279), transferred all functions "relating to the care of unaccompanied minors" from INS to ORR).  The agreement remains in effect today.  *E.O.H.C. v. Sec'y, U.S. Dep't Homeland Sec.*, 950 F.3d 177, 182 (3d Cir. 2020); *see Flores v. Barr*, 407 F. Supp. 3d 909, 914 (C.D. Cal. 2019) (determining that recently promulgated regulations did not terminate the *Flores* Agreement), *oral argument scheduled*, No. 19-56326 (9th Cir. Apr. 3, 2020).

In their brief, Respondents did not address the merits of Petitioner's *Flores* Settlement Agreement claim. *See* ECF 12 at 13.  They only contend that this Court lacks subject matter jurisdiction over the claim, because the *Flores* Agreement "is only enforceable in the jurisdiction in which it was executed."  *Id.* (citing *KMHC v. Barr*, No. 20-cv-00134-WQH-MSB, 2020 WL 614035, at *6 (S.D. Cal. Jan. 31, 2020)).  In *KMHC*, the petitioning minor, who was being held

at a Customs and Border Protection port of entry facility, claimed that her continued detention violated the *Flores* Agreement. *Id.* at \*3, \*5. The court concluded, however, that it lacked subject matter jurisdiction over the claim, because the minor's claim required "no interpretation of [federal law]." *Id.* at \*6. The court found that a "breach of settlement agreement claim is essentially a contract action against the federal government . . . and belongs, if anywhere, in the Court of Federal Claims." *Id.* (quoting *Munoz v. Mabus*, 630 F.3d 856, 864 (9th Cir. 2010)).

Petitioner, however, argues that this Court does have subject matter jurisdiction over his *Flores* Agreement claim. ECF 14 at 12-13. This Court agrees. In *EOHC*, the Third Circuit Court of Appeals considered the identical claim propounded by Respondents here. 950 F.3d at 191-94. The court rejected the argument, and concluded that all Article III courts have subject matter jurisdiction over alleged *Flores* Agreement violations. *Id.* at 192-94. The court reasoned that, while settlement agreements are typically treated as contracts, the *Flores* Agreement has one legally significant characteristic: the United States is a party to the Agreement. *Id.* at 192. "[W]hen the United States is a party to a contract, federal common law governs that contract." *Id.* Because "'claims founded upon common law' arise under the laws of the United States," allegations of *Flores* Agreement violations invoke the trial court's federal question jurisdiction pursuant to 28 U.S.C. § 1331. *Id.* at 192-93 (citation and alteration omitted).

The Third Circuit also, notably, distinguished cases like *Munoz*, which the district court in *KMHC* cited in its ruling. *EOHC*, 950 F.3d at 193; *see KMHC*, 2020 WL 614035, at \*5-6. As the Third Circuit explained, *Munoz* considered a damages claim arising from a contract to which the United States was a party. *See Munoz*, 630 F.3d at 863-64 & n.5. The *Munoz* court concluded that the plaintiff could only assert a breach of contract claim in the Court of Federal Claims, because the Tucker Act only waived the United States's sovereign immunity to damages

claims brought in the Court of Federal Claims.  *Id.*; *see EOHC*, 950 F.3d at 193.  The *Flores*

Agreement, however, "contains no such exclusive reservation of jurisdiction when it comes to an

individual minor's claims."  *EOHC*, 950 F.3d at 194; *see* FSA, ¶ 24(B) ("Any minor who

disagrees with the INS's determination to place that minor in a particular type of facility, or who

asserts that the licensed program in which he or she has been placed does not comply with the

standards set forth in Exhibit 1 attached hereto, may seek judicial review in any United States

District Court with jurisdiction and venue over the matter to challenge that placement

determination or to allege noncompliance with the standards set forth in Exhibit 1.  In such an

action, the United States District Court shall be limited to entering an order solely affecting the

individual claims of the minor bringing the action."); *see also id.* ¶ 9 ("This Agreement sets out

nationwide policy for the detention, release, and treatment of minors in the custody of the INS . .

. .").

   The Third Circuit's analysis is on all fours in this case.  Petitioner, a minor in ORR

custody, qualifies as a *Flores* Agreement class member.  Because the United States is a party to

that agreement, Petitioner's claim arises under the federal common law.  Claims arising under

the federal common law invoke the Court's subject matter jurisdiction.  Without any provision of

the *Flores* Settlement Agreement expressly limiting a district court's exercise of jurisdiction, this

Court adopts the rationale of the Third Circuit in *EOHC*, and concludes that subject matter

jurisdiction exists over Petitioner's claim.  *See* 950 F.3d at 192-94.

   As to the merits, the Court finds that Petitioner is likely to prevail on his *Flores*

Agreement claim.  "Without question courts treat consent decrees," like the *Flores* Agreement,

"as contracts for enforcement purposes."  *Flores v. Sessions*, No. CV 85-4544-DMG(AGRx),

2018 WL 10162328, at *2 (C.D. Cal. July 30, 2018) (quoting *United States v. Asarco Inc.*, 430

F.3d 972, 980 (9th Cir. 2005)); *accord United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 236 (1975) (noting that consent decrees and consent orders "have many of the attributes of ordinary contracts," and should be construed as such). Interpretation and enforcement of consent decrees, therefore, "are subject to traditional rules of contract interpretation, and the district court's authority is thus constrained by the language of the decree." *Thompson v. U.S. Dep't of Hous. & Urban Dev.*, 404 F.3d 821, 832 n.6 (4th Cir. 2005); *see also Johnson v. Robinson*, 987 F.2d 1043, 1046 (4th Cir. 1993) (noting that the Court may not "use its power of enforcing consent decrees to enlarge or diminish the duties on which the parties have agreed").

The *Flores* Agreement "creates a presumption in favor of releasing minors." *See Flores v. Barr*, 934 F.3d 910, 916 (9th Cir. 2019) (quoting *Flores v. Lynch*, 828 F.3d 898, 901 (9th Cir. 2016)). As relevant here, the Agreement generally provides that ORR "shall place each detained minor in the least restrictive setting appropriate to the minor's age and special needs," provided that the minor is not a flight risk, or a danger to himself or others. FSA, ¶ 11. The Agreement later sets forth a specific policy providing for the release of minors: "Where INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others, [ORR] *shall release* a minor from its custody." FSA, ¶ 14 (emphasis added). The Agreement then provides a list of preferred custodians, which includes "an adult relative (brother, sister, aunt, uncle, or grandparent)." *Id.* ¶ 14(C). Holding minors in violation of the Agreement constitutes a material breach of that Agreement. *See Flores v. Sessions*, No. CV-85-4544-DMG(AGRx), 2018 WL 4945000, at *2 (C.D. Cal. July 9, 2018).

Up until April 21, 2020, ORR acted in accordance with its obligations under the *Flores* Agreement. Upon taking custody of J.S.G. in January, 2020, ORR first placed him at BCC,

determining that a shelter care center was the least restrictive setting appropriate for his needs. ORR then worked to find a suitable individual sponsor and, in February, 2020, began the reunification process with J.S.G.'s grandfather.  ECF 12-1, ¶ 8.  Eventually, by April 14, 2020, ORR determined that J.S.G.'s grandfather would be a suitable sponsor.  *Id.*  J.S.G.'s release was complicated, however, by his potential exposure to another minor infected with COVID-19. ORR, understandably, did not want to release J.S.G. until it was sure that it could do so safely, without increasing the risk of further spreading the deadly virus.  *Id.* ¶¶ 9-10.  Ultimately, on or about April 20, 2020, ORR determined that J.S.G. could safely be released.  *Id.*  But on April 21, 2020, ICE/ERO informed ORR that it intended to remove J.S.G. from the country on May 4, 2020.  *Id.* ¶ 12.  At that point, ORR changed its mind, and decided to deny J.S.G.'s reunification application, "notwithstanding the suitability of J.S.G.'s grandfather and the minor's clearance for release by ORR health authorities."  *Id.* ¶ 13.

The *Flores* Agreement's plain text mandates release, as long as ORR determines that the minor will not be a danger to the community, a danger to himself, or a flight risk.  *See* FSA, ¶ 14. To date, Respondents have not intimated that J.S.G. poses a danger to himself or others.  *See, e.g.*, ECF 12-1, ¶ 6 ("According to shelter reports, J.S.G. is doing well in the shelter and has no behavioral difficulties.").  Nor is there any evidence that ORR denied J.S.G.'s reunification application because he was designated a flight risk.  Rather, ORR has merely concluded that "continued custody is appropriate given that removal is imminent."  *Id.* ¶ 13.  The Court is not aware of any cases, nor have Respondents pointed the Court's attention to any cases, holding that a minor's imminent removal automatically deems him a flight risk.  The closest case law to such a holding comes from a recent ruling by the district court overseeing the *Flores* Agreement, in which the court noted that "ICE may consider a minor's flight risk, under Paragraph 14 of the

[Agreement] and federal regulations, but a final order of deportation cannot be the dispositive consideration if removal is not 'imminent' . . . and there are no other indicia of a minor's flight risk."   Order Re Plaintiffs' Motion to Enforce at 18, *Flores v. Barr*, No. CV 85-4544-DMG(AGRx) (C.D. Cal. Apr. 24, 2020), ECF 740 [docketed in this case as ECF 24-1].

Even assuming that this recent *Flores* ruling stands for the proposition that ORR may deny reunification based solely on an imminent removal, the ruling is inapposite for two reasons. First, Respondents here have not shown that J.S.G.'s removal is actually imminent.  Despite ICE's assertion that it will deport J.S.G. on May 4, ECF 12-1, ¶ 12, the parties confirmed at the hearing that Guatemala is no longer accepting removals from the United States, due to the COVID-19 outbreak.  *See also* José de Córdoba & Juan Montes, *Guatemala Suspends Deportation Flights from U.S. on COVID Fears*, WALL STREET J. (Apr. 16, 2020), https://www.wsj.com/articles/guatemala-suspends-deportation-flights-from-u-s-on-covid-fears-11587093900.  During the hearing, counsel for Respondents could provide no update on the resumption of removals to Guatemala.  At this current posture, then, ORR appears willing to hold J.S.G. in perpetuity, because the prompt resumption of such removals is far from assured in the unprecedented circumstances of a worldwide global pandemic.  The current posture of J.S.G.'s prospective removal is one not contemplated under the *Flores* Agreement.  *See Flores*, 2018 WL 4945000, at *2.

Second, and more fundamentally, the Agreement's presumption in favor of releasing minors imposes a duty on ORR to consider, based on each minor's particular case, whether he is a flight risk.  *See Flores*, 934 F.3d at 916-17 (holding that the Agreement requires even minors subject to expedited removal must be considered for release from pre-removal ORR custody); *Flores v. Sessions*, 394 F. Supp. 3d 1041, 1067 (C.D. Cal. 2017) ("[T]he Court will order

Defendants to comply with the unambiguous charge of the *Flores* Agreement to make *individualized* determinations regarding a minor's flight risk rather than blanket determinations.").  It is for this reason that ORR's treatment of J.S.G. likely violates the *Flores* Agreement.

ORR's treatment of J.S.G. up until April 21, 2020 demonstrates that it previously harbored no concerns that J.S.G. was a flight risk.  J.S.G. is currently residing at BCC, which is a private residential care shelter licensed by the State of Maryland.  ECF 12-1, ¶ 6.  Shelter care facilities, by ORR's definition, provide care and programming "in the least restrictive environment."  OFFICE OF REFUGEE RESETTLEMENT, U.S. DEP'T OF HEALTH & HUMAN SERVS., ORR GUIDE: CHILDREN ENTERING THE UNITED STATES UNACCOMPANIED, *Guide to Terms* (2016), https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied -guide-to-terms [hereinafter "ORR Policy Guide"].  If a minor in ORR custody posed a flight risk, then ORR's guidelines counsel in favor of placing that minor in, at minimum, a "staff secure facility," which "maintains stricter security measures . . . in order to control disruptive behavior and to prevent escape."  ORR Policy Guide, *Guide to Terms*; *id.* § 1.2.5.  J.S.G.'s final order of removal was in place when her first entered ORR's custody in January, 2020, yet ORR exhibited no concern that he would be a flight risk – even though ORR knew that J.S.G. had failed to appear for his initial immigration court date.

There is also no evidence that, after learning of J.S.G.'s imminent removal from the country, ORR determined that J.S.G. posed a flight risk.  First, J.S.G. remained at the residential care shelter, and was not transferred to a more secure facility.  Second, as noted, ORR's stated rationale for denying reunification is that "continued detention is appropriate given that removal is imminent."  ECF 12-1, ¶ 13.  When pressed to expand on this during the hearing, counsel for

Respondents first indicated that the rationale was a "combination" of J.S.G.'s being a flight risk, given the imminent nature of removal, and the "practicality of facilitating that removal." Later on, when the Court specifically asked Respondents' counsel to address the merits of Petitioner's *Flores* Agreement claim, counsel asserted that if the Court determined that it had jurisdiction over the *Flores* claim, *only then* would Respondents contend that J.S.G. is a flight risk. Counsel's assertions therefore demonstrate that labeling J.S.G. a flight risk is simply a post-hoc justification of J.S.G.'s continued detention to facilitate and ease his removal by ICE.

The Court does not intimate to be in a better position than ORR to determine whether J.S.G. poses an undue flight risk. Nor is the Court directing ORR to find, in this particular case, that J.S.G. is not a flight risk. Rather, the *Flores* Agreement unambiguously requires that ORR consider an individual minor's particular circumstances, and determine whether his release will create a danger to the community, a danger to the minor himself, or a risk that the minor will not appear for future removal proceedings – *not* whether his continued detention makes his future removal more efficient for ICE. If there was some evidence that ORR had considered the changing circumstances, in light of J.S.G.'s prior, and current, behavior, and deemed him a flight risk, the *Flores* Agreement's dictates would be satisfied. But that evidence is, on the current record, severely lacking, if not totally absent.

Respondents have not determined that J.S.G. is a flight risk, a danger to himself, or a danger to others. Respondents have located a suitable individual sponsor for J.S.G.'s release for custody. Respondents have also determined that J.S.G. may safely be released to his grandfather, without increasing the risk of COVID-19 spreading to members of the general public. All of this occurred on April 20, 2020. At that point, the *Flores* Agreement mandated that ORR "shall release" J.S.G. FSA, ¶ 14. Respondents' continued custody of J.S.G. for

reasons unrelated to risk of flight is causing "unnecessary delay" of his release.  *Id.*  J.S.G. is

therefore likely to succeed on the merits of his *Flores* Agreement claim.

> 2.    Petitioner Is Likely to Succeed on his Claim under the Trafficking Victims Protection Reauthorization Act of 2008

Petitioner next argues that his continued detention at BCC violates his rights under the

Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA" or "the Act"), 8 U.S.C. §

1232 (2018).  Respondents, correctly, do not contest that Petitioner is an "unaccompanied alien

child" ("UAC"), as defined by the TVPRA.  ECF 7 at 14-15; *see* 8 U.S.C. § 1232(g); 6 U.S.C. §

279 (2018).  Petitioner argues that Respondents' delay in releasing him to his grandfather

violates the TVPRA's statutory mandate.  ECF 7 at 15-18.  This Court agrees, in part.[2]

The TVPRA "partially codified the [*Flores*] Settlement by creating statutory standards

for the treatment of unaccompanied minors."  *Flores*, 828 F.3d at 904; *see Flores v. Sessions*,

862 F.3d at 870-71.  The law places with the Department of Health and Human Services the

responsibility to care for, and take custody of, all unaccompanied alien children.  8 U.S.C. §

1232(b)(1).  If some other governmental agency first obtains custody of the UAC, then under the

TVPRA, that agency must transfer the child to HHS within seventy-two hours.  *Id.* § 1232(c)(2).

Once in ORR's custody,[3] the TVPRA mandates that UACs "shall be promptly placed in the least

restrictive setting that is in the best interest of the child."  *Id.* § 1232(c)(2)(A).  When

determining where to place a UAC, the Secretary of HHS "may consider danger to self, danger

---

[2] This Court does not agree, on the current record, that J.S.G. has established violative delay simply by virtue of the fact that ORR's evaluation of his proposed sponsor, Hernandez, has taken more time than the average case.  The COVID-19 pandemic has caused many ordinary tasks to take inordinate amounts of time, and has caused massive disruption generally.  On the limited record before the Court, the Court is persuaded that through April 20, 2020, ORR was acting diligently to process J.S.G.'s reunification application.  Indeed, even when prompted at the hearing, Petitioner was unable to identify any specific unreasonable delay.

[3] As noted, the Homeland Security Act transferred to ORR the responsibility of caring for unaccompanied minors.  *See* 6 U.S.C. § 279(a), (b)(1)(A), (g)(2).

to the community, and risk of flight." *Id.*  If the Secretary is placing a UAC with an individual sponsor, the Secretary must first find that the individual "is capable of providing for the child's physical and mental well-being," and must, in some circumstances, conduct a home study of the individual sponsor's abode. *Id.* § 1232(c)(3)(A)-(B).

While the TVPRA "preserves the *Flores* Settlement," *Flores*, 862 F.3d at 871 & n.7, Respondents are correct that the text of the statute does not *compel* ORR to release a UAC to an individual sponsor.  For example, § 1232(c)(3)(A) provides that "an unaccompanied alien child may not be placed with a person or entity unless the Secretary of Health and Human Services makes a determination that the proposed custodian that the proposed custodian is capable of providing for the child's physical and mental well-being."  Moreover, the fact that ORR "may consider" factors such as the UAC's danger to the community, and the UAC's risk of flight, demonstrates that the UAC does not have a categorical right to be released to a sponsor. *See id.* § 1232(c)(2)(A).

However, Respondents' proposed reading of § 1232(c)(2) as not considering release to an individual sponsor, but instead only governing ORR's placement of a UAC within an ORR facility, ECF 12 at 6-7, is untenable.  As several courts have noted, release to a sponsor is one of those "least restrictive setting[s]" the TVPRA contemplates. *See, e.g.*, *Mendez Ramirez v. Decker*, No. 1:19-cv-11012-GHW, 2020 WL 1674011, at *3 (S.D.N.Y. Apr. 3, 2020); *JECM ex rel. Saravia v. Lloyd*, 352 F. Supp. 3d 559, 588 (E.D. Va. 2018); *Ramirez v. ICE*, 310 F. Supp. 3d 7, 26-30 (D.D.C. 2018) (concluding that ICE detainees who aged out of ORR custody were likely to succeed in demonstrating that ICE failed to comply with § 1232(c)(3)'s requirement that ICE "consider placement in the least restrictive setting available," because ICE did not consider any alternative to detention programs, such as placement with an individual sponsor).

Respondents have not cited any cases to the contrary.   Further, this Court's reading of §

1232(c)(2) does not, as Respondents urge, conflict with 8 U.S.C. § 1231, for that provision

applies only to ICE's general delegated authority to detain aliens for the ninety-day period prior

to their removal from the United States.  *See* § 1231(a)(1); *id.* § 1231(a)(2) ("During the removal

period, the *Attorney General* shall detain the alien." (emphasis added)).   It does not impact

ORR's specific, statutorily-imposed obligations with regards to a certain sub-category of aliens,

UACs.   *See id.* § 1232(b)(1) ("[T]he care and custody of all unaccompanied alien children,

*including responsibility for their detention*, where appropriate, shall be the responsibility of the

Secretary of Health and Human Services." (emphasis added)); *id.* § 1232(c)(2); *D.B. v. Cardall*,

826 F.3d 721, 735-39 (4th Cir. 2016) (applying the statutory construction rule that "the specific

terms of a statutory scheme govern the general ones," and concluding that § 1232(c)(2)'s specific

provision requiring the detention of UACs, if ORR determines that there is no suitable individual

sponsor to reunify the UAC with, prevails over the general statutory provision, 8 U.S.C. § 1226,

requiring release of an alien after the termination of his immigration proceedings).

Here, for many of the same reasons that Petitioner is likely to succeed on his *Flores*

Agreement claim, he is also likely to succeed on his TVPRA claim.  The Court appreciates the

fact that oftentimes, as here, ORR must consider a minor's placement in rapidly changing

circumstances.  But there is simply no evidence here to show that ORR, in considering J.S.G.'s

reunification application in light of his pending removal, made an individualized determination

of J.S.G.'s application, as the statute requires.  *See Ramirez*, 310 F. Supp. 3d at 26-30.  Instead,

ORR appears to have relied solely on the administrative convenience of keeping J.S.G. in

continued custody, without any consideration for J.S.G.'s individual needs.  "The focus of the

TVPRA is on minors' 'physical and mental well-being' and the potential 'custodian's identity

and relationship to the child," as well as the custodian's ability to care for the child. *JECM*, 352 F. Supp. 3d at 388 (quoting 8 U.S.C. § 1232(c)(3)(A)).  ORR's concerns for assisting ICE with its administrative efficiency, while understandable, do not comport with the TVPRA's focus on the best interests of the minor in ORR custody.  Because ORR has already determined that J.S.G.'s grandfather is a suitable sponsor, and that releasing J.S.G. is feasible even in light of the current COVID-19 pandemic, ORR's continued custody of J.S.G. for reasons unrelated to his best interests likely violates the TVPRA's mandate that he be "promptly" released to his grandfather.

### 3.   Release, in the Form of a TRO, Is the Proper Remedy at this Stage

Petitioner's requested TRO seeks to compel ORR to release him from BCC to his grandfather's custody during the pendency of his immigration proceedings.  ECF 7 at 31. "Habeas corpus is, at its core, an equitable remedy."  *Schlup v. Delo*, 513 U.S. 298, 319 (1995). When a habeas petition is properly within the Court's jurisdiction, the Court is empowered to "dispose of the matter as law and justice require."  28 U.S.C. § 2243 (2018).  In other words, § 2243 vests the Court "with the largest power to control and direct the form of judgment to be entered" in habeas cases.  *Hilton v. Braunskill*, 481 U.S. 770, 775 (1987) (quoting *In re Bonner*, 151 U.S. 242, 261 (1894)); *see also Lemon v. Kurtzman*, 411 U.S. 192, 200-01 (1973) (plurality opinion) ("In equity, as nowhere else, courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests . . . .").  In appropriate circumstances, this broad discretion includes the authority to "delay the release of a successful habeas petitioner in order to provide the [government] an opportunity to correct" its unlawful conduct.  *Hilton*, 481 U.S. at 775.

Under different facts, the Court would likely afford ORR another opportunity to undertake the proper procedure to determine whether to reunify J.S.G. with his grandfather. Here, however, granting ORR additional time to make its decision "would afford [J.S.G.] empty, largely meaningless relief, given the proximity to his eighteenth birthday." *Santos v. Smith*, 260 F. Supp. 3d 598, 615 (W.D. Va. 2017). J.S.G. will age out of ORR's custody on April 28, 2020, losing his entitlement to release under the *Flores* Agreement. The Court does not find that ORR, or the other Respondents, intentionally delayed a decision on J.S.G.'s reunification application in order to make a transfer to ICE detention on his eighteenth birthday all but certain. The fact remains, however, that the time for Respondents to remedy the procedural shortfalls here has run out. Thus, at this posture and on this record, the Court finds that issuing a TRO compelling ORR to release J.S.G. is the appropriate remedy. *Id.*; *see also Beltran v. Cardall*, 222 F. Supp. 3d 476, 489 (E.D. Va. 2016) (granting a UAC's request for release because affording the UAC additional process would be "of marginal benefit").

## B. Petitioner Is Likely to Suffer Imminent, Irreparable Harm Absent a TRO

Petitioner has also demonstrated that he will likely suffer irreparable harm absent a TRO providing for his release. This Court may only issue a TRO if Petitioner can show that he is "likely to suffer irreparable harm before a decision on the merits can be reached." *Winter*, 555 U.S. at 22. This irreparable harm must be "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1992) (citation omitted). "[H]arm is not 'irreparable' if it can be compensated by money damages." *Person v. Mayor & City Council of Baltimore*, 437 F. Supp. 2d 476, 479 (D. Md. 2006) (citing *Hughes Network Sys. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994)). Moreover, issuing a TRO "based only on a possibility of irreparable harm is inconsistent

with [the Fourth Circuit's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a 'clear showing' that the plaintiff is entitled to relief." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Winter*, 555 U.S. at 22).

Respondents contend that Petitioner's continued potential exposure to COVID-19 while in ORR custody is not a sufficiently irreparable harm. ECF 12 at 18–20. The Court appreciates, and does not doubt the sincerity of, ORR's efforts to implement measures to limit the spread of COVID-19 within facilities holding minors in ORR custody. *See, e.g.*, ECF 12-5. Nonetheless, this Court agrees with the growing consensus of courts finding that continued detention in a custodial setting during the COVID-19 pandemic presents an imminent, irreparable harm warranting injunctive relief where the other factors can be met. *See, e.g.*, *Xochihua-Jaimes v. Barr*, 798 F. App'x 52, 52 (9th Cir. 2020) (ordering, *sua sponte*, that an immigration detainee be "immediately released from detention and that removal of Petitioner be stayed," given the COVID-19 crisis); *Fraihat v. ICE*, No. EDCF 19-1546 JGB (SHKx), 2020 WL 1932570, at *27 (C.D. Cal. Apr. 20, 2020) ("Even in the early days of the pandemic, and with few exceptions, courts did not hesitate to find irreparable harm as a result of potential COVID-19 exposure in prison and detention, including in facilities where there had not been a confirmed case. At this stage of the pandemic, the threat is even clearer. The number of immigration detainees testing positive for COVID-19 continues to increase at an alarming rate." (citation omitted)); *Banks v. Booth*, Civil No. 20-849(CKK), 2020 WL 1914896, at *11 (D.D.C. Apr. 19, 2020) ("Plaintiffs' risk of contracting COVID-19 and the resulting complications, including the possibility of death, is the prototypical irreparable harm."); *Malam v. Adduci*, Civil No. 20-10829, 2020 WL 1899570, at *4 (E.D. Mich. Apr. 17, 2020) (finding that, despite ICE's and the local county correctional facility's precautionary measures, COVID-19's "asymptomatic nature of

transmission, the impossibility of adequate social distancing in communal detention spaces, and the inability or unwillingness to test all inmates and staff, Petitioner remains at an unreasonable and substantial risk of infection and consequently of dire health consequences, including death"); Order Re Plaintiffs' *Ex Parte* Application for Restraining Order and Order to Show Cause Re Preliminary Injunction at 12, *Flores v. Barr*, No. CV 85-4544-DMG(AGRx) (C.D. Cal. Mar. 28, 2020), ECF 740 [docketed in this case as ECF 1-7] ("[E]ven if ORR and ICE take more urgent preventative measures, Plaintiffs have demonstrated that 'they themselves are likely to suffer irreparable harm absent an injunction' that may aid in securing their release" (citation omitted)).

Respondents' two additional contentions both ring hollow.  First, they argue that Petitioner will suffer no irreparable harm because there are no officially confirmed COVID-19 cases at BCC.  This contention, however, is short-sighted.  If kept in continued ORR custody, the parties agree that it is all but a certainty that ICE will assume custody of Petitioner on Tuesday, April 28, when he turns eighteen years old, and will transfer him to an adult detention facility.  As the cases cited above demonstrate, despite ICE's efforts to contain COVID-19, the disease's ability to rapidly spread through asymptomatic individuals is alarming – particularly in custodial situations such as ICE detention facilities.  *See Malam*, 2020 WL 1899570, at *4; ECF 1-7 at 12.  Second, Respondents assert that Petitioner cannot demonstrate that releasing him to his grandfather's care in South Carolina will abate this harm, given the spread of the disease in that state.  ECF 12 at 18-19.  This argument ignores, however, the ability for Petitioner to self-quarantine with his grandfather in the privacy of his grandfather's home and to practice social distancing in a non-custodial setting.  These efforts, health officials generally agree, are the most effective in combating the spread of COVID-19.  Aside from general contentions about the number of COVID-19 cases in South Carolina, Respondents have identified no reason why the

grandfather's home would not be safe.  Indeed, ORR's home study report, conducted in the midst of the COVID-19 crisis, provided a positive recommendation for his sponsorship of Petitioner. Accordingly, Petitioner is likely to suffer imminent, irreparable harm absent a TRO.

### C.    The Balance of the Equities, and the Public Interest, Favor Petitioner

Finally, Petitioner has demonstrated that the balance of the equities, and the public interest, counsel in favor of issuing an injunction.  Courts often consider these final two factors for injunctive relief together.  *See Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 602 (4th Cir. 2017), *as amended* (June 15, 2017), *vacated and remanded on other grounds sub nom.*, *Trump v. Int'l Refugee Assistance*, 138 S. Ct. 353 (2017) ("As the district court did, we consider the balance of the equities and the public interest factors together.").

The Court recognizes the public's interest, and Respondents' equitable interest in, the enforcement of the country's immigration laws.  *See, e.g.*, *United States v. Martinez-Fuerte*, 428 U.S. 543, 556-58 (1976); *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981).  However, on the facts as currently presented to this Court, those interests are outweighed by Petitioner's interest in the enforcement of the United States's contractual obligations, combined with the severity of the harm he suffers through increased exposure to COVID-19, *see Fraihat*, 2020 WL 1932570, at *28 ("[T]here can be no public interest in exposing vulnerable persons to increased risks of severe illness and death."); ECF 1-7 (The severity of the harm to which Plaintiffs are exposed and the public's interest in preventing outbreaks of COVID-19 among families and children in ICE or ORR custody that will infect ICE and ORR staff, spread to others in geographic proximity, and likely overwhelm local healthcare systems tips the balance of equities sharply in Plaintiffs' favor.").  Despite the fact that the Court's ordered relief here is mandatory in nature, the burden on ORR is slight, given that they

have not found that J.S.G. is a flight risk.   As such, releasing J.S.G. to the custody of his grandfather will not undermine Respondents' interest in enforcing our country's immigration laws.  *Compare with Torres Advanced Enter. Sols. LLC v. Mid-Atl. Prof'ls Inc.*, No. PWG-12-3679, 2013 WL 531215, at *5-6 (D. Md. Feb. 8, 2013) (finding that the equities, and the public interest, weighed against entering an injunction to further a private litigant's contractual rights, because it would jeopardize the U.S. Department of State's ability to "assure the security of its embassy personnel in a dangerous and volatile environment").   Moreover, again, despite the public's interest in the enforcement of immigration laws, the public has a countervailing interest in ensuring that its Government adheres to its contractual obligations.  *Cf. Cherokee Nation of Oklahoma v. Leavitt*, 543 U.S. 631, 646 (2005) (rejecting interpretation of a statute that would require repudiation of the Government's contractual obligations).   Additionally, granting relief that reduces the risk of the further spread of COVID-19 also significantly furthers the public interest.  *See Banks*, 2020 WL 1914896, at *12 ("[G]ranting injunctive relief which lessens the risk that Plaintiffs will contract COVID-19 is in the public interest because it supports public health."); *Barbecho v. Decker*, No. 20-cv-2821(AJN), 2020 WL 1876328, at *7 (S.D.N.Y. Apr. 15, 2020).   Accordingly, Petitioner has established all four requisite elements for the issuance of a TRO.

### D.    The Court Will Require Only a Nominal Bond

Though neither party addresses this requirement, the Court must independently determine the proper amount of a bond.  Federal Rule of Civil Procedure 65(c) provides that no temporary restraining order can be issued unless the party awarded injunctive relief is required to post a bond in a sum that "the court deems proper."  The bond shall secure "the payment of such costs and damages as may be incurred or suffered" by the enjoined party if a later court deemed them

"wrongfully enjoined." *Id.*  The bond requirement "is mandatory and unambiguous." *District 17, UMWA v. A&M Trucking, Inc.*, 991 F.2d 108, 110 (4th Cir. 1993).  Thus, a district court commits legal error if it fails to require a bond upon issuing a TRO.  *See Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999).  The determination of the precise amount to be posted as a bond, however, rests in the Court's discretion.  *Id.*

In determining a proper bond amount, the Court "should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction." *Id.* at 421 n.3.  The bond amount, therefore, "ordinarily depends on the gravity of the potential harm to the enjoined party." *Id.*  If the risk of harm to the enjoined party is "remote," then "a nominal bond may suffice" in certain circumstances.  *Id.* (citing *Int'l Controls Corp. v. Vesco*, 490 F.2d 1334 (2d Cir. 1974)); *accord Hassay v. Mayor*, 955 F. Supp. 2d 505, 527 (D. Md. 2013).

Here, the Court finds that the harm to Respondents here from the issuance of a TRO is remote, which justifies the issuance of a nominal bond.  There is no concern of unjust enrichment to Plaintiff, in terms of monetary gain.  Further, to the extent the Court could consider any potential financial harm to the Government in having to locate Petitioner if he does not appear for removal proceedings, as elucidated above, Respondents have failed to demonstrate that this risk has been substantiated.  Moreover, a TRO requiring the release of Petitioner does not impact Respondents' enforcement of the immigration laws vis-à-vis other detainees.  Therefore, a nominal bond of $1.00 suffices in this case.  Petitioner must post his $1.00 bond before the TRO can take effect.  *See Md. Dep't of Human Res. v. U.S. Dep't of Agric.*, 976 F.2d 1462, 1483 (4th Cir. 1992) ("Failure to require a bond before granting [temporary] injunctive relief is reversible error."); *see also id.* at 1483 n.21 (describing the bond requirement as a "condition precedent" to

injunctive relief (citation omitted)).    Chambers will provide counsel with specific instructions for posting the bond on Monday, April 27, 2020, given the current limited operation of the Clerk's Office.

Finally, the Court notes that it discussed with the parties at the hearing whether it made sense to consider Petitioner's Request for a Temporary Restraining Order and Request for a Preliminary Injunction simultaneously.  Upon further reflection, this Court has determined that it is appropriate only to consider the request for TRO at this time.  There are many dynamic factors presented in this case, including J.S.G.'s pending birthday, his pending appeal of his removal order and corresponding request for a stay, and the United States Government's negotiations with the Guatemalan Government regarding removal of its citizens from the United States.  The posture of those situations today either definitely will, or possibly could, change dramatically over the coming days, making a subsequent hearing more appropriate.  The laws applying to J.S.G.'s immigration status will certainly change in the intervening period, as he becomes an adult subject to ICE's authority. Thus, this Court will schedule a preliminary injunction hearing, to be conducted by telephone conference, on Thursday, May 7, 2020, at 1:30 p.m.

## IV.    CONCLUSION

For the reasons set forth above, Petitioner's Motion for a Temporary Restraining Order, ECF 7, will be GRANTED.  A separate implementing Order follows.


Dated:  April 26, 2020                                          _____/s/_____
                                                                Stephanie A. Gallagher
                                                                United States District Judge